# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| DALE ROBIN SHIKLE, as personal representative of the Estate of Sandra Duke Shikle,<br><br>    **Plaintiff,**<br><br>v.<br><br>MATT GENTRY, FLOYD LEE, SAMANTHA STOUT, and KAITLYN THOMAS,<br><br>    **Defendants.** | Civil Action Number<br>**5:20-cv-01442-AKK** |

## MEMORANDUM OPINION

Dale Robin Shikle sues four Cullman County Detention Center officials following the tragic death by suicide of his wife, Sandra Duke Shikle, who was incarcerated there. Mr. Shikle contends that CCDC staff knew of but failed to address Mrs. Shikle's risk of self-harm through medical observation or attention. In their summary judgment motion, the defendants—Sheriff Matt Gentry, Warden Floyd Lee, and Sergeants Samantha Stout and Kaitlyn Thomas—assert their entitlement to qualified immunity. *See* docs. 47; 49. The motion is briefed, *see* docs. 51; 52, and, unfortunately for Mr. Shikle, it is due to be granted.[1]  Viewed most

---

[1] The defendants also move for leave because their summary judgment brief exceeds the court's page limit by three pages. Doc. 46. In light of the breadth of documents and other evidence cited in this case, the court will grant the motion and consider the brief in its entirety.

favorably to Mr. Shikle, the evidence does not suggest that Sergeants Stout and Thomas had knowledge of Mrs. Shikle's risk of self-harm, and Sheriff Gentry and Warden Lee cannot be liable as supervisors in the absence of a constitutional violation.

## I.

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Summary judgment is due "if the movant shows that there is no genuine dispute as to any material fact." *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmovant must then establish a genuine issue for trial, meaning "that a reasonable jury could return a verdict for the nonmoving party." *Catrett*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At this stage, the court construes the evidence and reasonable inferences arising from it in the light most favorable to the nonmovant. *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020). "And if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Id.* But "mere conclusions and unsupported factual allegations are legally insufficient to

defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

## II.

Mrs. Shikle was booked into CCDC in February 2018. *See* doc. 44-7. Sergeant Thomas, then a detention deputy, gave Mrs. Shikle an "initial classification assessment," during which Mrs. Shikle denied having "been under the care of a psychiatrist in the last six months" or having "attempted suicide in the last five years." *See* docs. 44-4 at 6, 12–13; 44-8. CCDC thereafter placed Mrs. Shikle in the women's "Echo Block." *See* doc. 44-2 at 9–10.

On June 20, 2018, Mrs. Shikle's daughter, Selina Stricklin, called CCDC to report that her mother had made suicidal comments during their last phone conversation. Docs. 44-6 at 6; 44-26 at 2. After speaking with Stricklin, Deputy Christina James listened to a recording of the conversation between Stricklin and Mrs. Shikle. Doc. 44-26 at 3. The conversation included the following:

> [MRS. SHIKLE]: Can you call the attorney for me?
>
> [STRICKLIN]: I called them yesterday. They never called me back.
>
> [MRS. SHIKLE]: Well, I can't talk –
>
> [STRICKLIN]: They were supposed to call me back and tell me when they were going to try to talk to the judge, and she never called me back.
>
> * * *
>
> [MRS. SHIKLE]: I can't talk to them about that over there. That's fine. I mean, I can't do this anymore. I'm done. I'm – (inaudible) – they can't

do that now. I'm sorry I bothered you. I love you, I love them, and I'm going to go. Bye.

Doc. 44-12 at 5. According to Stricklin, Mrs. Shikle "cut [their conversation] short" and implied to Stricklin that she "wanted to take her life" and did not "want to keep living the way she was living." Doc. 44-6 at 6.

Deputy James, observing that Mrs. Shikle sounded "sad and upset," went to Mrs. Shikle's cell to "speak privately." Doc. 44-26 at 3–4. Deputy James recounted that during this conversation, Mrs. Shikle "strongly denied having any suicidal thoughts and stated that [Stricklin] was overreacting." *Id.* at 4. Deputy James concluded that Mrs. Shikle was not suicidal, reported these events to Sergeant Stout, and "documented the incident in [Mrs.] Shikle's jail file," *id.*, which reads:

> . . . [A] female called the booking desk and stated that i/m Shikle had made suicidal comments on her last phone call. I, Deputy James, asked for the time of the phone call and then listened to it . . . . I then . . . pulled i/m Shikle out to the yard to speak in private. I aske[d] her multiple times if she felt like she was going to harm herself or anyone else. She stated that she had no plans to do so and would not attempt anything of that nature. . . .

Doc. 44-11 at 2 (original in caps lock). Sergeant Stout also entered the following in CCDC's email logs, which fellow CCDC officers received daily:

> I/m Shikle, Sandra family called and advised that she was suicidal, Deputy James went and spoke with the inmate and she stated she was not suicidal. All of the incident was recorded on Deputy James body cam log# 583448.

Doc. 44-10 at 2 (original in caps lock). Purportedly, "the body-cam footage of the conversation was overwritten automatically." Doc. 49 at 14 n.8.

Later, CCDC transferred Mrs. Shikle to a different dormitory for participation in a work-release program. Docs. 44-2 at 9–10; 44-11 at 2. On September 19, 2018, Mrs. Shikle was caught with a cell phone at her workplace, and CCDC returned her to Echo Block in a two-person cell without a cellmate. Docs. 44-2 at 9–10; 44-14 at 2. CCDC apparently received no further reports about Mrs. Shikle's mental state or suicidal thoughts. *See* doc. 44-6 at 6.

On the night of September 27, 2018, and into the next morning, Sergeant Thomas served as the acting shift supervisor. Doc. 44-4 at 6. Sergeant Thomas recalled that, per routine, the cells were locked down at 10 p.m. and officers conducted laundry distribution in Echo Block at 4 a.m. *Id.* at 10. According to Sergeant Thomas, although officers would generally also perform cell checks between those hours, CCDC was one officer short and "that night was pretty busy with people coming in to be booked in or released," so the officers "were backing off on doing cell checks." *Id.* at 10–11. Consequently, Sergeant Thomas delegated at least some of the cell checks to Deputy David Wheeler. *Id.* at 11.

Just after 4 a.m., Deputy Wheeler discovered that Mrs. Shikle had hanged herself in her cell using bed sheets. Docs. 44-2 at 16; 44-15. CCDC records reflect that

> Ems was notified after Detention Deputy David Wheeler responded to E block for Laundry exchange at approximately 0415hrs. Detention Deputy David Wheeler witnessed inmate Sandra Shikle hanging, by her bed sheets, from the top bunk of her cell. Detention Deputy David

5

> Wheeler notified Detention Deputy Kaitlyn Pate [Thomas] of the situation. Detention Deputy Cody Baker and Ronald Ozbolt responded to Eblock and administered CPR. . . .

Doc. 44-15 at 4. An autopsy confirmed that Mrs. Shikle died by suicide. Doc. 44-16 at 2.

Mr. Shikle, proceeding as personal representative of Mrs. Shikle's estate, subsequently sued CCDC officers and staff for their alleged deliberate indifference to Mrs. Shikle's suicide risk under 42 U.S.C. § 1983. *See* docs. 1; 5. Relevant to Mr. Shikle's lawsuit is the CCDC Policy related to suicide prevention. CCDC Policy defines a "suicidal inmate" as "an inmate who has attempted suicide, threatened suicide, or has exhibited behavior which would lead a reasonable person to suspect that an inmate may be suicidal." Doc. 44-25 at 2. CCDC Policy further provides:

> All suspected inmates should be designated 'suicidal' in all logs. All incidents involving suspected suicidal behavior shall be reported on incident reports, logs, and to supervisors. Each shift shall inform personnel on the next relieving shift of any such behavior and of any special precautions which should be implemented. Medical Staff is to be notified as soon as possible about a suicidal inmate. . . .
>
> * * *
>
> Under some circumstances, the inmate may be able to function best in multiple inmate housing where the inmate may be watched . . . . If circumstances are such that the inmate cannot be placed in a cell with another inmate, she shall be placed in an isolation cell which is equipped with closed circuit television. . . .
>
> * * *

> All isolation cells shall be checked at least every thirty minutes and every fifteen minutes when occupied by a suspected suicidal inmate. No inmate who is isolated for any reason, other than certain persons isolated for medical reasons or for administrative segregation, shall be allowed to have razors, or any other items with which to harm himself. . . .

*Id.* at 2–3.

### III.

Mr. Shikle brings § 1983 claims against Sergeants Stout and Thomas individually and against Sheriff Gentry and Warden Lee as supervisors. *See* doc. 5 at 7–9. For their part, the defendants claim entitlement to qualified immunity and argue that none of them exhibited deliberate indifference to Mrs. Shikle's suicide risk. *See* doc. 49 at 21–23. The court addresses the claims against Sergeants Stout and Thomas before turning to the supervisors, Sheriff Gentry and Warden Lee.

### A.

"Government officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1268 (11th Cir. 1999)). If the official meets her or his burden of establishing that she or he was performing a discretionary function at the time of the alleged misconduct, the plaintiff must establish (1) the violation of a constitutional

right and (2) that the right was "clearly established" at the time of the incident(s). *Id.*; *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

Sergeants Stout and Thomas have sufficiently established that they were acting within their discretionary authority while helping operate CCDC during the incidents.[2] *See Holloman*, 370 F.3d at 1265–66; doc. 49 at 22. Therefore, the burden shifts to Mr. Shikle to establish a Fourteenth Amendment violation by "show[ing] that the jail official[s] displayed deliberate indifference to [Mrs. Shikle's] taking of [her] own life." *See Jackson*, 787 F.3d at 1353 (emphasis omitted). Deliberate indifference has three components: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id.* (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

Consequently, "[w]here prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835–36 (11th Cir. 1990). However, "[a]n officer 'cannot be held liable under [§] 1983 for the suicide of a prisoner who never had threatened or attempted suicide and who had never been

---

[2] For instance, Sergeant Thomas booked Mrs. Shikle into CCDC and screened her for health concerns, Sergeant Stout made records and relayed information about inmates, and both supervised and delegated tasks to deputies. *See generally* doc. 49. Mr. Shikle does not seem to dispute that they acted within their discretionary authority. *See generally* doc. 51.

considered a suicide risk.'" *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1269 (11th Cir. 2005). Thus, the court must grant summary judgment in the defendants' favor unless Mr. Shikle presents evidence of the defendants' subjective awareness of Mrs. Shikle's risk of self-harm, *see Jackson*, 787 F.3d at 1353, and their subsequent disregard of that risk by more than negligence. Because "[e]ach individual [d]efendant must be judged separately and on the basis of what that person knows," *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008), the court "analyze[s] what each officer knew about [Mrs. Shikle's] risk for suicide at the time of [her] death." *See Jackson*, 787 F.3d at 1354.

1.

Although Mr. Shikle does not cite specific evidence of Sergeant Thomas's alleged knowledge, the court discerns the following from the evidence and the briefing generally. First, Sergeant Thomas booked Mrs. Shikle into CCDC in February 2018 and gave her a classification screening that asked whether she had received psychiatric care in the last six months or attempted suicide in the last five years, to which Mrs. Shikle responded in the negative. *See* docs. 44-4 at 6, 12–13; 44-8. Second, Sergeant Thomas, like the other officers at CCDC, received daily email logs from superiors, including the message from Sergeant Stout indicating that a caller had reported Mrs. Shikle as suicidal, that Deputy James had listened to the call and spoken with Mrs. Shikle, and that Mrs. Shikle had told Deputy James that

9

she was not suicidal. Docs. 44-4 at 5; 44-10 at 2. *See also* doc. 51 at 5. And third, Sergeant Thomas served as the acting shift supervisor on the morning that Deputy Wheeler, whom Sergeant Thomas assigned to do cell checks, discovered that Mrs. Shikle had hanged herself in her cell. Doc. 44-4 at 10–11.

To be sure, if Sergeant Thomas knew that Mrs. Shikle was suicidal, then Sergeant Thomas's failure to follow CCDC Policy for suicide threats by, for instance, conducting more frequent cell checks during her shift, could have constituted deliberate indifference. However, the evidence does not illustrate that Sergeant Thomas "had subjective knowledge that there was a strong risk that [Mrs. Shikle] would attempt suicide and deliberately did not take any action to prevent that suicide." *See Snow*, 420 F.3d at 1270. Outside of the daily report she received from Sergeant Stout, whose message said that Mrs. Shikle had denied suicidal ideation, no evidence shows that Sergeant Thomas was aware of any likelihood that Mrs. Shikle would harm herself. *See id.* at 1269. Deputy James actually reported that her review of the phone call that led to Stricklin's report did not contain indications of suicidal ideation. Doc. 44-26 at 3. As a result, based on the information available to her, Sergeant Thomas cannot be liable under § 1983 for deliberate indifference.

2.

Mr. Shikle maintains that after Deputy James reported Stricklin's call, Sergeant Stout should have treated Mrs. Shikle as suicidal in accordance with CCDC

10

Policy but instead "sen[t] another detention deputy to confirm whether Shikle was or was not suicidal." Doc. 51 at 8. Mr. Shikle asserts that "[o]nce [Mrs.] Shikle told the other deputy that she was not suicidal, [Sergeant] Stout's inquiry ended[,] and she took no further action," meaning that Sergeant Stout impermissibly and unilaterally decided that Mrs. Shikle did not require further care even though "it is undisputed that [Mrs.] Shikle was suicidal." *Id.* at 5, 8–9 (internal quotation marks omitted).

The parties sharply dispute, however, whether Sergeant Stout should have considered Mrs. Shikle suicidal. As noted, CCDC Policy defines a "suicidal inmate" as "an inmate who has attempted suicide, threatened suicide, or has exhibited behavior which would lead a reasonable person to suspect that an inmate may be suicidal." Doc. 44-25 at 2. And the parties seem to agree that if a person meets this criteria, CCDC Policy dictates certain procedures for observing and caring for that person. But while Mr. Shikle maintains that Sergeant Stout knew that "[Mrs.] Shikle threatened suicide" and failed to designate her as such, *see* doc. 51, the defendants claim that Stricklin's "single call to [CCDC], at most, showed a mere possibility of suicide" that did not require Sergeant Stout to classify Mrs. Shikle as suicidal and provide corresponding care, *see* doc. 52.

Viewed most favorably to Mr. Shikle, the evidence and permissible inferences arising from it illustrate that (1) Stricklin told Deputy James that Mrs. Shikle was

11

suicidal based on recent comments Mrs. Shikle made over the phone; (2) Deputy James listened to that phone call to see if it supported Stricklin's concerns; (3) Deputy James then followed up with Mrs. Shikle, who told Deputy James she was not suicidal; and (4) Deputy James reported this to Sergeant Stout, who noted the phone call and Deputy James's conversation with Mrs. Shikle in her own logs to share with the other officers. While Sergeant Stout perhaps could have pressed the issue further, this evidence does not suggest that Sergeant Stout had any other knowledge suggesting Mrs. Shikle posed a risk of self-harm, whether through past incidents, additional reports from relatives or officers, or other observations. *See* doc. 44-26 at 3. Because Sergeant Stout's knowledge of these facts, without more, "[was] not sufficient to put [her] on notice of 'a strong likelihood rather than a mere possibility that the self-infliction of harm [would] occur,'" *Snow*, 420 F.3d at 1269, Sergeant Stout also cannot be liable under § 1983 for deliberate indifference.[3]

B.

Mr. Shikle claims that Sheriff Gentry and Warden Lee are liable under § 1983 for their status as supervisors and for failing to adequately train or supervise

---

[3] In the court's common-sense view, one usually cannot easily discern whether a person is contemplating self-harm on the basis of one interaction, and the decision to follow up with that person may rest on evidence that is, by nature, an incomplete look into that person's life. But in this Circuit, the court's analysis must focus on the information of which the defendant was subjectively aware at the time. *See also Greenway v. S. Health Partners, Inc.*, 827 F. App'x 952, 959 (11th Cir. 2020) ("Given the screening she conducted, her interactions with Tammy, and her lack of knowledge of any issues with Tammy, we cannot say that one warning by two relatives gave Sergeant Chapman knowledge of a strong likelihood of a suicide risk.").

12

Sergeants Thomas and Stout.  To hold these defendants liable as supervisors, Mr. Shikle "must show that [they] either directly participated in the unconstitutional conduct or that a causal connection exists between [their] actions and the alleged constitutional violation." *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047–48 (11th Cir. 2014).  And to pin liability on these defendants for failing to train the sergeants, Mr. Shikle must address

> (1) whether, in failing adequately to train and supervise subordinates, [Sheriff Gentry and Warden Lee were] deliberately indifferent to [Mrs. Shikle's] mental health care needs; (2) whether a reasonable person in [their] position[s] would know that [their] failure[s] to train and supervise reflected deliberate indifference; and (3) whether [their] conduct was causally related to the constitutional infringement by [their] subordinate[s].

*See Greason*, 891 F.2d at 836–37.

The court understands Mr. Shikle to argue that Sheriff Gentry and Warden Lee are liable because Sergeant Stout should have classified Mrs. Shikle as suicidal under CCDC Policy but failed to follow these guidelines and because, as supervising officers, they also received Sergeant Stout's email logs and knew of Stricklin's call to CCDC.  *See* doc. 51 at 9.  However, because the evidence does not establish that Sergeant Thomas or Sergeant Stout acted with deliberate indifference, *see supra* § III.A, the court cannot conclude that Sheriff Gentry or Warden Lee directly

participated in unconstitutional conduct[4] or indirectly caused a constitutional violation, nor can the court infer that they failed to train or supervise their subordinates in a manner that violated Mrs. Shikle's constitutional rights. *See Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008) ("There can be no supervisory liability . . . if there was no underlying constitutional violation by [the subordinate]."). As a result, Mr. Shikle's claims cannot proceed against Sheriff Gentry or Warden Lee under these theories of liability, and the defendants' motion, doc. 47, is due to be granted.

## IV.

There are no words this opinion can express to account for the loss of Mrs. Shikle, including the pain of Mr. Shikle losing his wife and Ms. Stricklin losing her mother. The law is a blunt and sometimes insensitive tool for the important journey of grieving—and, despite the legal system's inability to offer relief, the court has compassion for those making this journey. In this case, unfortunately, Mr. Shikle's claims cannot proceed because the evidence does not indicate a constitutional violation necessary for direct or supervisory liability under § 1983. A separate order follows this opinion.

---

[4] To the extent that Mr. Shikle claims that Sheriff Gentry and Warden Lee directly engaged in a constitutional violation because they received Sergeant Stout's email logs, this argument is unfortunately unavailing for the reasons discussed as to Sergeant Thomas. *See supra* § III.A.1.

**DONE** the 8th day of July, 2022.

                                                  _____
                                                        **ABDUL K. KALLON**
                                            UNITED STATES DISTRICT JUDGE